# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON AND LONDON
MARKET COMPANIES SUBSCRIBING
TO POLICY NUMBER DC1602445, and
NEW PRIME, INC.,

       Plaintiffs,

v.

TRIMAC TRANSPORTATION GROUP,
INC., and DONALD HUGONIN,

       Defendants/Third-Party Plaintiff,

v.

BISHOP TRANSPORT, LLC,

       Third-Party Defendant.

No. 1:18-cv-00336-DHU-LF
(Consolidated with 1:17-cv-01217-DHU-JHR)

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on (i) Trimac Transportation Group, Inc. ("Trimac") and

Donald Hugonin's *Daubert* Motion and Motion in Limine to Exclude Opinions of V. Paul

Herbert (**Doc. 163**), (ii) and Plaintiff Certain Underwriters at Lloyd's of London and London

Market Companies Subscribing to Policy Number DC1602445's ("Certain Underwriters")

Motion to Preclude Opinions of Trimac Transportation Group, Inc.'s Experts Patrick and

Stephanie Brecht (**Doc. 189**).

Having considered the motions, briefs, law, and being otherwise fully advised of the

premises, the Court GRANTS the motion to exclude testimony that a tractor-trailer driver was

"reckless" because this is for the jury to decide. The Court further DENIES the motion to

exclude the testimony of Defendant Trimac's expert witnesses because these witnesses are qualified, and their testimony is reliable and relevant.

**A.**
**BACKGROUND**

Plaintiff Certain Underwriters is an insurance company. It insured a cargo of several hundred pharmaceutical products distributed by third-party AmerisourceBergen Company ("ABC"). *See* Proposed Pretrial Order, Doc. 200, 4, 13.[1] ABC contracted with New Prime, a licensed motor carrier, to transport the cargo at 41°F in a temperature-controlled vehicle owned by New Prime. *Id*. at 9, 13. New Prime in turn hired Joel Bishop of Bishop Transport to drive the load. *Id*.

On December 17, 2016, a driver for Trimac allegedly rear-ended the truck containing the pharmaceutical cargo and tore a hole in the temperature-controlled box. *Id*. at 4–5. The pharmaceutical products allegedly became compromised after hours of exposure to the environment or spillage onto the highway. *Id*. The next day, the drug products were placed on a replacement truck and driven to California. ABC contacted the manufacturer of each pharmaceutical product and inquired if the manufacturer believed its products could be returned to inventory. Doc. 172, 6. Most manufacturers believed there was no way to guarantee their drug products were safe for consumer sale, and so determined that the products should not be sold.

ABC became responsible for damages to the cargo and paid costs to the pharmaceutical manufacturers. Certain Underwriters paid ABC for the loss and then filed a subrogation action against Trimac on December 18, 2017 in the Fourth Judicial District, Guadalupe County, New

---

[1] Unless otherwise noted, the Court refers to the page numbers imprinted by the Court's Case Management/Electronic Court Files system.

Mexico. *See* Notice of Removal, Doc. 1-1. Trimac removed the complaint to this Court based on diversity jurisdiction in April 2018. *Id.*

### B.
### EVIDENTIARY LEGAL STANDARDS

Under Federal Rule of Evidence 104, a district court "must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible." Fed. R. Evid. 104(a). Federal Rule of Evidence 702 permits expert testimony when the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and four factors are met: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

"In evaluating the admissibility of expert testimony, 'the district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). "First, the district court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion." *Schulenberg*, 911 F.3d at 1282 (quotation marks omitted). "Second, if the expert is sufficiently qualified, the district court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* (quotation marks omitted). Trial courts have the responsibility of ensuring that scientific testimony or evidence is both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993). The proponent of the expert bears the burden by a

preponderance of the evidence to establish that the requirements for admissibility have been met. *Nacchio*, 555 F.3d at 1251.

Concerning reliability, the district court must "determine whether the expert's opinions are supported by sound reasoning and methodology." *Delsa Brooke Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1172 (10th Cir. 2020) (citing *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1222 (10th Cir. 2018)). Expert testimony must have "a reliable basis in the knowledge and experience of [the expert's] discipline," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999) (quoting *Daubert,* 509 U.S. at 592)), and be "based on actual knowledge, not 'subjective belief or unsupported speculation.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590)).

A court should consider the following non-exhaustive and non-dispositive factors in determining whether particular expert scientific testimony is reliable: whether the expert's technique or theory can and has been tested; the theory has been subject to peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence and maintenance of standards and controls; and the general acceptance of the methodology in the relevant scientific community. *Kumho*, 526 U.S. at 149–50. This list "neither necessarily nor exclusively applies to all experts or in every case," as the relevance of some factors can "depend[ ] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho*, 526 U.S. at 141 (citation omitted). *Daubert*'s reliability factors "are not to be applied woodenly in all circumstances," *United States v. Medina-Copete*, 757 F.3d 1092, 1103 (10th Cir. 2014), and district courts applying *Daubert* "have broad discretion to consider a variety of other factors." *Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002).

The court's focus must be solely on the proposed expert's principles and methodology, not on the conclusions they generate. *Daubert*, 509 U.S. at 595. "The plaintiff need not prove that the expert is undisputably correct.... Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). "Although it is not always a straightforward exercise to disaggregate method and conclusion, when the conclusion simply does not follow from the data, a district court is free to determine that an impermissible analytical gap exists between premises and conclusion." *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005) (citation omitted).

"The relevance inquiry encompasses Rule 702's requirement that the evidence '[help] the trier of fact to understand the evidence or to determine a fact in issue.'" *Delsa*, 976 F.3d at 1172 (quoting *Daubert*, 509 U.S. at 591). Evidence is relevant if it has "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Bitler*, 400 F.3d at 1234 (quoting Fed. R. Evid. 401). To determine whether expert testimony will help the trier of fact, courts look to "whether the testimony is relevant," "within the juror's common knowledge and experience," and "whether it will usurp the juror's role of evaluating a witness's credibility." *United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Cir. 2013) (citation and quotation marks omitted). "[T]he 'assist' requirement is satisfied where expert testimony advances the trier of fact's understanding to any degree." *Id.* at 1297 (citation omitted). "[C]ourts must conduct a common-sense inquiry into whether a juror would be able to understand certain evidence without specialized knowledge." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014) (citation

and quotation marks omitted). "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Id*.

The *Daubert* court recognized the "liberal thrust" of the Federal Rules of Evidence and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588 (internal quotation marks omitted). "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

The Federal Rules of Evidence allow a qualified expert "to opine on an 'ultimate issue' to be decided by the trier of fact." *United States v. Schneider*, 704 F.3d 1287, 1293 (10th Cir. 2013) (citing Fed. R. Evid. 704(a)). Although an expert may not give an impermissible legal conclusion, an expert may give testimony that embraces an ultimate issue so long as the expert's testimony assists, rather than supplants, the jury's judgment. *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015). Expert "[w]itnesses are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions." *United States v. Bishop*, 926 F.3d 621, 632 (10th Cir. 2019). "The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern." *Richter*, 796 F.3d at 1195 (citation and quotation marks omitted). "Even if [an expert's] testimony arguably embraced the ultimate issue, such testimony is permissible as long

as the expert's testimony assists, rather than supplants, the jury's judgment." *United States v. Dazey,* 403 F.3d 1147, 1171–72 (10th Cir. 2005).

Although the court is required to conduct a *Daubert* examination of all experts before it, it need only expressly address the specific objections before it. *United States v. Avitia-Guillen*, 680 F.3d 1253, 1259 (10th Cir. 2012) ("When a party fails to object to an expert's methodology, the district court need not make explicit findings.") (citing *United States v. Velarde,* 214 F.3d 1204, 1209 n.3 (10th Cir. 2000) (noting that the defendant did not challenge the doctor's "credentials, expertise, or qualifications to testify as an expert")); *Macsenti v. Becker*, 237 F.3d 1223, 1233 (10th Cir. 2001) (specific findings on the record only required on party's objection); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 n.2 (10th Cir. 2000) (when no objection is raised, district courts are not required to make "explicit on-the-record rulings" and, "we assume that the district court consistently and continually performed a trustworthiness analysis sub silentio of all evidence introduced at trial.")

Finally, under Federal Rule of Evidence 403 even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Tenth Circuit "*favors* admission of all relevant evidence not otherwise proscribed; thus, exclusion under this rule is an extraordinary remedy." *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014) (emphasis in original, citation and quotation marks omitted); *United States v. Otuonye*, 995 F.3d 1191, 1206 (10th Cir. 2021) ("The exclusion of relevant evidence under Rule 403 is an extraordinary remedy to be used sparingly.")

## C.
## DISCUSSION

### A. Motion to Exclude Patrick and Stephanie Brecht (Doc. 189)

7

### 1. The Brechts Are Qualified as Experts

Trimac designated Patrick and Stephanie Brecht "to opine on issues surrounding pharmaceutical and motor carrier industry standards and best practices [about] the storage loading, stowage, and recovery of pharmaceutical products." Doc. 194, 2. Since 1994, Dr. Patrick Brecht has been a principal consultant and president of P.E.B. Commodities, Inc., ("P.E.B."), an international service company specializing in expert consultation and forensics services. *See* Curriculum Vitae of Patrick Brecht, Pl.'s Ex. A, Doc. 172-2 ("Dr. Brecht CV"). Dr. Brecht received a PhD in Plant Physiology from the University of California, Davis in 1969 and undergraduate and master's degrees from California universities. *Id.* at 64. After working in academia, Dr. Brecht served in various private industry roles in domestic and international processing, handling, storage, and transportation of perishable products and he has been a scientific advisory board member to the Global Gold Chain Alliance. *Id.* at 59, 62. He has been P.E.B.'s principal forensic investigator for perishable product cases involving fruits and vegetables, pharmaceuticals, frozen meat, poultry, seafood, and other materials. *Id.* at 62. Concerning pharmaceuticals, he has provided expert services in cases involving validation testing, nonconforming materials, packaging, physical damage, temperature management, refrigeration technologies, warehouses, transportation, and consulting on FDA and government regulations. *Id.* at 59. Dr. Brecht has authored several professional publications relevant to his professional field.

Stephanie Brecht has been an independent consultant with P.E.B since 2019 and provides expert consultation and forensic services involving pharmaceuticals, food, grains, beverages, and other perishables. *See* Curriculum Vitae of Stephanie Brecht, Pl.'s Ex. A, Doc. 172-2. Ms. Brecht graduated in 1992 from the University of California, Davis with a Bachelor of Science in

Fermentation Science. *Id.* at 69. From 1995 – 2015 she served various roles with the bioscience division of Baxter Healthcare Corporation and has experience in quality system management, labeling, product, integrity, corrective and preventative action, clinical quality training, and project management. *Id.* at 68-69. She has experience creating standard operating procedures to and has been a presenter at international conferences about product integrity. *Id.* at 65-66.

The Court qualifies the Brechts to testify as experts under Fed. R. Evid. 702. Certain Underwriters does not challenge Ms. Brecht's qualifications. As for Dr. Brecht, Certain Underwriters only challenges his qualifications to opine about "validating" a refrigerated truck. The Court overrules that objection and sets forth its rationale below of why the Brechts' proffered opinions are reliable and relevant.

### 2. The Brechts' Opinions are Reliable and Relevant

The Brechts prepared original and supplemental reports in 2020. *See* Original and Supplemental Reports of Dr. Patrick Brecht and Stephanie Brecht, Pl.'s Exs. A & B, Doc. 172-2 (collective referred to as the "Brechts Report"). Trimac designated the Brechts to opine primarily about whether ABC, New Prime, "and all those involved in the [post-accident] recovery did or did not adhere to industry standards and best practices." Doc. 194 at 6. The Brechts' original and supplemental reports and attachments appear to be around 150 pages long of highly technical facts and conclusions. The Court limits its analysis to the five specific challenges Certain Underwriters raises in its *Daubert* motion.

<u>Misleading Temperature Information and Portable Monitors</u>

According to the Brechts, the cargo contained hundreds of products from 45 drug manufacturers. Brechts Report at 5, 9. After the accident ABC emailed each manufacturer high and low crash scene temperatures of 33°F and 0°F and sought the manufacturers' advice on how

to dispose of the drug products. *Id*. at 14. The Brechts claim that ABC's temperature data to the manufactures was "misleading" because ABC relied on online weather readouts instead of the truck's own temperature recorder. *Id*. at 15.

When the Brechts looked at the truck's temperature recorder's data, it showed the ambient temperature did not dip below 8°F. *Id*. The Brechts concluded that "[c]learly, the pharma cargo was not subjected to ambient air temperatures of 0°F as ABC misrepresented to the manufactures." *Id*. In addition, the Brechts faulted ABC or New Prime for not using interior portable temperature monitors. Had such monitors been installed, they claim, "monitoring at the product level would have provided temperature data representative of the product stowed … during transit as well as the effect of an accident, refrigeration breakdowns/derangements, off-power events and the like on the temperature of the pharma items." *Id*. at 30.

Certain Underwriters claims that these opinions are based on speculation. The Court disagrees. The report makes clear that the Brechts reached their conclusions by comparing the website's temperature data to the truck's actual temperature recordings, which is a methodology. Concerning portable monitors, the Brecths stated that it would have a "best practice" to use such units. *Id*. Dr. Brecht's opinion on best practices is grounded in Dr. Brecht's education, knowledge, and research. Dr. Brecht has authored numerous publications in the field of product shipping and it appears that his opinions in this area have been subjected to peer review. *See Daubert*, 509 U.S. at 593–94 (reliability factors include testing, peer review and publication, acceptance by scientific community). In addition to reliance on scientific, government and industry publications, the Brechts reviewed case facts from discovery. In total, their report referenced 41 different sources materials that they relied upon to form their opinions. The Court

10

concludes that the Brechts' opinions on ABC's allegedly misleading temperature data and portable temperature units are reliable.

The Court also concludes that the Brechts' opinions are relevant. Testimony concerning ABC's temperature data given to manufactures and best practices will assist the jury in assessing the weight and credibility of ABC's decision to dispose of the drug products. The subject of this testimony is likely outside the common knowledge of jurors and will therefore be helpful. *See Archuleta*, 737 F.3d at 1296 (expert testimony is relevant if the subject-matter of the testimony is not normally "within the juror's common knowledge and experience[.]")

<u>Lack of an Emergency Planning</u>

The Brecths opined that "neither ABC nor [New] Prime had created a detailed emergency action plan for dealing with an accident during transport and, as a result there was no clear-sighted or decisive plan in place to lessen the damage to the pharmaceutical products and/or to effectively mitigate the claimed loss." Brechts Report at 20. They also stated that no evidence indicated that a corrective and preventative action (CAPA) plan – a standard system to prevent and mitigate risk – was used by ABC or New Prime. *Id*. Certain Underwriters argues that these opinions are speculative and unhelpful, that the Brecths' report does not discuss underlying data, and that the Brechts' deposition statements belie many of their opinions.

The Court concludes that the Brechts' testimony about lack of emergency planning is reliable. In addition to relying on their education, knowledge, and review of standards and case facts, the Brechts reviewed the deposition testimony of ABC's own witnesses to support their conclusion that ABC had no written policies for handling high value drug products. Ms. Brecht testified that she has been trained on CAPA. *See* Deposition of Stephanie Brecht, 130:15-18, Doc. 194-1 ("S. Brecht Depo.") This indicates that CAPA is a formal system used by others in

11

Ms. Brecht's field of expertise. Because the Brecths' conclusions are grounded in a methodology, their opinion on lack of emergency planning is admissible.

Certain Underwriters argues that the Brecths' expert report did not disclose data on which they relied and that their deposition statements differ from their report. However, those are matters for the jury to evaluate during cross-examination of the witnesses. *See In re Urethane Antitrust Litig.*, 768 F.3d at 1263 (the jury evaluates "the reliability of the underlying data, assumptions, and conclusions" of the expert). Concerning relevancy, the Court also concludes that the Brecths' opinions would help the jury. The Brecths' testimony will help the jury assess ABC's decision to dispose of the drug products and therefore the testimony will be helpful.

## Qualifying and Validating a Refrigerated Vehicle

The Brecths' report discussed qualifying and validating a refrigerated vehicle. "When a contract carrier is used," they said, "the shipper (ABC) has a duty to ensure that the carrier's vehicles are appropriately qualified," which means the equipment is functionally able "to do whatever job it is specified to do." Brecths Report at 49; Depo. of Dr. Patrick Brecht, 116:13-("Dr. Brecht Depo."). Under a World Health Organization ("WHO") document, "the shipper has a duty to ensure that the carrier's vehicles are appropriately qualified." Brecths Report at 25. The "qualification procedure," according to the WHO, should "demonstrate that the temperature distribution within the payload area of the temperature-controlled compartment is maintained within the range specified for the products being tested" and "[d]efine zones within the vehicle's payload area that are not packed with TTSPPs [time and temperature-sensitive pharmaceutical products]." *Id*. at 25-26.

Validation is a process to ensure that temperature is controlled throughout the manufacturing, storage, handling and distribution environments used to address unforeseen occurrences. *Id.* at 27.

After describing the purpose of validation testing and the WHO rule and other standards, the Brechts opined that, based upon their review of the evidence, ABC did not adhere to these standards. *Id.* They stated that no evidence indicated that ABC maintained the temperature distribution within the payload within a +2.0°C to + 8.0°C range; that ABC used a qualification procedure to assess actual product temperatures for commonly used load layouts; that ABC used a qualification procedure to analyze anticipated ambient temperature extremes during normal operations. *Id.*

Certain Underwriters argues that Dr. Brecht is unqualified to offer an opinion about validation because he stated during his deposition that he has never qualified a refrigerated trailer for a pharmaceutical client. *See* Deposition of Dr. Patrick Brecht, 25:18-24; 26:13-16, Doc. 172, 200-01 ("Dr. Brecht Depo."). However, Dr. Brecht is clearly experienced in truck validation generally, even if he has not validated a truck hauling pharmaceutical items specifically. He has conducted validations his "whole career," *id.* at 26:6-7, and he is a scientific advisory council member of the Global Cold Chain Alliance, a cold chain industry group. Dr. Brecht CV at 12. "[A]s long as an expert stays within the reasonable confines of his subject area," which Dr. Brecht has done, then "a lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) (quotation marks and citation omitted); *United States v. Channon*, No. CR 13-966 JCH, 2015 WL 13666980, at *3 (D.N.M. Jan. 8, 2015) ("It is an abuse of discretion to exclude a witness as an expert if the witness is 'generally qualified.'") Dr. Brecht's credentials in

this area are beyond any serious dispute. That he has not validated a truck carrying drugs specifically goes to the weight, not admissibly, of his testimony.

The Court also concludes that the Brecths' opinions are the product of the reliable principles and methods and will be admissible. They referred to a WHO and cGMP standard, and specifically stated that their analysis of those standards was based upon the review of case facts, which constitutes a methodology. The Court acknowledges that Dr. Brecht's testimony was ambiguous about whether the validation requirements applied to drug manufactures or a drug wholesalers. *Compare* Dr. Brecht Depo. at 23:9-10, Doc. 172, 225, *with id.*, at 121:9-14. However, this is not a basis to exclude his opinion. As the Tenth Circuit has explained, "[n]ot every issue raised about an expert's opinion requires the testimony to be excluded" because "many of those concerns can be addressed through vigorous cross-examination." *Foust*, 989 F.3d at 847. Therefore, any inconsistencies or ambiguities in Dr. Brecht's opinions can be explored at trial.

The Court also concludes that the opinion concerning validation or qualification would assist the jury and are therefore relevant. The average juror is unlikely to know about industry standards and regulations concerning truck equipment validation, and thus the Brecths' testimony on this matter will provide needed context for the jury to understand the facts in issue.

<u>Cargo Stowage</u>

The Brechts opined that the 40 pallets of drug items were incorrectly stowed in both the damaged trailer and the replacement trailer that transloaded the drug items from New Mexico to California. Brechts Report at 51. The pallets were double stacked with inadequate air circulation. *Id*. Double stacking of "dissimilar cartons … most likely resulted in crush/ripped cartons and potential damage," the Brechts said. *Id*. at 51. As for air circulation, they explained that the

pallets' stowage in the damaged and replacement trailer "likely subjected [the pallets] to excessively cold temperatures … during sub-freezing ambient conditions due to conduction/heat transfer across the sidewalls of the tailers." *Id*. at 38. In addition, the drugs were shipped on wood pallets, which "manufactures are not allowed to use" because of concerns of nails, sharp edges, and cross-contamination with things like mold or pests. *Id*. at 51.

Certain Underwriters asserts that these opinions are speculative and unhelpful. According to Certain Underwriters, Dr. Brecht did not "calculate" how the stowage layout affect temperature; he could not explain "how quickly product temperatures changed after the collision"; and he did not say how the stowage layout, double stacking, or use of wood pallets actually caused damage to the items. Doc. 189 at 15-16.

The Court holds that the Brechts' opinions are reliable and relevant. Concerning air circulation and double stacking, they explained in some detail that "insufficient airflow can result in high and/or low temperature pockets called microenvironments within cartons, pallets and the entire load" so that "[p]allet loads of pharma items should be loaded in a basic pattern that maximizes temperature management … with top-air delivery." Brechts Report at 33, 50. They stated that double stacking of dissimilarly shaped cartons most likely resulted in crush or ripped cartons and potential damage and made the items so "tightly stowed … with little or no space between for the conditions airflow to protect the pharma items from temperature abuse." *Id*. at 36. In reaching these opinions, the Brechts reviewed videos and photographs of the cargo from the scene and referenced standards from the WHO, the United States Department of Agriculture, and the University of California and University of Florida. *Id*. at 34. The Brechts' opinions are therefore grounded in published documents, their review of relevant discovery material, and their

knowledge and expertise. The Court concludes that the Brechts' opinions concerning cargo layout and storage are reliable and admissible.

Concerning relevancy, the Court concludes that the Brechts' opinions would assist the trier of fact. After the accident, ABC apparently asked the individual drug manufactures whether their products were saleable based on temperature stability information that ABC reported to the manufactures. Testimony from the Brechts about how "temperature management of the pharma items was no doubt compromised due to improper stowage," Brecths Report at 36, is therefore relevant. Moreover, the average lay juror is likely unaware about how stowage layout or patterns affect cargo temperatures. Nor is the average juror aware of the industry standards governing cargo stowage. The Brechts' testimony therefore will assist the jury.

### Temperature Listings

Certain Underwriters' final *Daubert* challenge concerns opinions made primarily by Ms. Brecht. Ms. Brecht evaluated shipping temperature product labels from 640 drug items, a sample representing 94% of the drugs in the cargo. *Id*. at 122. She found that only 19% of the drugs bore labels indicating they needed to be shipped in the 35°F – 46°F range. *Id*. at 124. The other 81% of drugs in the cargo did not bear labels indicating that range. *Id*. ABC's bill of lading indicates that the cargo was transported on a reefer unit set to 41°F. *Id*. at 79.

The Court concludes that Ms. Brechts' opinions are relevant and admissible. She stated that she analyzed drug product labels' storage requirements by looking at pharmaceutical manufactures' webpages and various public medical resources that post online information about prescribing, patient education, and storage requirements for U.S. prescription drugs, all of which reflects the use of a methodology. Ms. Brecht's opinions are also relevant. Her testimony will assist the jury to understand the issues regarding the necessity of shipping drug products at

16

certain temperatures, especially since Certain Underwriters intends to offer expert testimony that "storing" and "shipping" temperatures may not be the same. *See* Expert Rebuttal Report of Dr. Sheryl Martin-Moe, Doc. 166-2, 4-5.[2] In accordance with the "liberal thrust" of the Federal Rules and considering Certain Underwriters' opportunity to cross-examine Ms. Brecht and present competing expert testimony, the Court concludes that Ms. Brecht's testimony on temperature label listings will be admissible. *Daubert*, 509 U.S. at 588.

### B. Motion to Exclude V. Paul Herbert's Testimony About Recklessness (Doc. 163)

#### 1. Mr. Herbert is Qualified as an Expert

Certain Underwriters designated V. Paul Herbert as a rebuttal witness to rebut the Trimac's commercial motor vehicle expert, Lew Grill. Doc. 220 at 5. Mr. Herbert has been in the trucking industry for about 35 years. *See* Rebuttal Report of V. Paul Herbert, C.P.S.A., 1, Doc. 163-1 ("Herbert Report"). He started his career as a dump truck driver in 1975 and has driven different types of commercial motor vehicles and hauled a variety of loads. *Id*. Mr. Herbert also worked as a Nevada state trooper, where he was given specialized training and assignments for commercial vehicle crashes. *Id*. at 2. Mr. Herbert returned to various other trucking industry roles until 1990, when he established the Western Motor Carrier Safety Institute, Inc., a compliance consulting service. *Id*.

Mr. Herbert's experience includes teaching courses at the North American Transportation Management Institute. He teaches courses on "motor fleet safety supervision," "advanced motor fleet safety," and "motor fleet trainer." *Id*. at 2–3. Since the 1980s, he has regularly audited and evaluated the safety and management program of several hundred trucking companies. As an

---

[2] The Court explains Dr. Sheryl Martin-Moe's testimony in a separate Memorandum Opinion and Order.

auditor he evaluates a company's fleet safety program, driver training records, driver qualifications and monitoring practices, and other systems related to fleet safety. *Id*. at 3.

Trimac does not challenge Mr. Herbert's qualifications or experience to testify as expert. Because there is no objection to his qualifications, the Court holds that Mr. Herbert is qualified to testify as an expert. His decades in the trucking industry provide him the necessary skill, experience, and training to render an expert opinion under Fed. R. Evid. 702.

### 2. Mr. Herbert May Not Opine About "Reckless" Driving

Mr. Herbert was originally retained to testify about Trimac's fleet safety program to support Certain Underwriter's negligent hiring, retention and/or supervision claim against Trimac. But as the litigation evolved, Certain Underwriters voluntarily dismissed that claim. According to Certain Underwriters, "the overwhelming majority" of Trimac's *Daubert* challenge to its expert, Mr. Herbert, is "moot." Doc. 220, 5. Given the narrowed scope of issues, the Court limits its analysis to the parties' single dispute: whether Mr. Herbert may opine that Trimac's driver was "driving was reckless." *Id*.

Mr. Herbert's specific opinion was that the operator's driving speed of 50 m.p.h. on "slick roadway, under these conditions, while approaching stopped traffic, [was] nothing less than reckless." *Id*. at 10. He continued that "[s]uch a speed on snow and ice covered roadways, especially while approaching stopped vehicles, was clearly reckless." *Id*. at 10–11. Trimac moves to exclude these statements as impermissible legal conclusions. Certain Underwriters argues that the testimony establishes the standard of care and Trimac's breach of that standard, that his opinions are reliable, and that Mr. Herbert did not use the term "reckless" in a strictly legal sense.

The Court holds that Mr. Herbert may not testify that Trimac's driver's conduct was "nothing less than reckless" or "clearly reckless." Even though Mr. Herbert discussed several industry and government safety standards to reach this conclusion, courts generally find that expert testimony that a defendant was "reckless" or "acted 'recklessly'" is inadmissible because it "expresses a purely legal conclusion." *Sadler v. Advanced Bionics, LLC*, No. 3:11-CV-00450-TBR, 2013 WL 1340359, at *4 (W.D. Ky. Apr. 1, 2013); *Sec. & Exch. Comm'n v. Goldstone*, No. CIV 12-0257 JB/LFG, 2016 WL 3135651, at *44 (D.N.M. May 10, 2016) ("[an expert] may not state whether [the defendant]'s behavior was 'reasonable' or 'reckless,' as that is the ultimate legal conclusion for the jury.") (quoting *In re Longtop Financial Technologies Ltd. Securities Litigation*, 32 F. Supp. 3d 453 (S.D.N.Y. 2014)). Certain Underwriters portrays Mr. Herbert's testimony as non-legal and non-technical. But as these authorities indicate, "recklessness" does in fact have a specific legal meaning – "the intentional doing of an act with utter indifference to the consequences" – which is precisely for the jury to decide. *Baldonado v. El Paso Nat. Gas Co.*, 143 N.M. 288, 296, 176 P.3d 277, 285 (N.M. 2008). Accordingly, Mr. Herbert may not opine that the conduct of Trimac's driver was "nothing less than reckless" or "clearly reckless."

If Certain Underwriters intends to alternatively admit Mr. Herbert's testimony concerning recklessness as lay opinion testimony under Rule 701, Trimac's motion to exclude such testimony is granted. "Rule 701 applies only '[i]f the witness is not testifying as an expert.'" *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (quoting Fed. R. Evid. 701). Under Federal Rules of Evidence 602 and 701, "a witness can testify about something only if he or she has personal knowledge." *United States v. Tapaha*, 891 F.3d 900, 906 (10th Cir. 2018). "A court should exclude testimony for lack of personal knowledge only if … it finds that

the witness could not have actually perceived or observed that which he testifies to." *Gutierrez de Lopez*, 761 F.3d at 1132 (citation and quotation marks omitted).

Mr. Herbert could not have perceived or observed the facts of his proposed testimony concerning recklessness. His information is based on what he read and learned about the case, not what he personally saw or perceived. Accordingly, Mr. Herbert may not offer testimony concerning recklessness as lay opinion testimony under Rule 701.

Considering these rulings, the Court does not address or decide Trimac's final argument to exclude the testimony under Fed. R. Civ. P. 403 as unfairly prejudicial. The Court finds the testimony inadmissible based Rule 701 and Rule 704 as described herein. This ruling only applies to Mr. Herbert's opinion about reckless; nothing else in this Opinion limits Mr. Herbert's anticipated expert testimony.

## CONCLUSION

For the reasons stated herein, it is therefore **ORDERED** that:

1. Trimac Transportation Group, Inc. and Donald Hugonin's *Daubert* Motion and Motion in Limine to Exclude Opinions of V. Paul Herbert **(Doc. 163)** concerning "recklessness" is **GRANTED**.

2. Plaintiff Certain Underwriters at Lloyd's of London and London Market Companies Subscribing to Policy Number DC1602445's Motion to Preclude Opinions of Trimac Transportation Group, Inc.'s Experts Patrick and Stephanie Brecht **(Doc. 189)** is **DENIED**.

HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE