## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON AND LONDON
MARKET COMPANIES SUBSCRIBING
TO POLICY NUMBER DC1602445, and
NEW PRIME, INC.,

      Plaintiffs,

v.                            No. 1:18-cv-00336-DHU-LF
                                (Consolidated with 1:17-cv-01217-DHU-JHR)

TRIMAC TRANSPORTATION GROUP,
INC., and DONALD HUGONIN,

      Defendants/Third-Party Plaintiff,

v.

BISHOP TRANSPORT, LLC,

      Third-Party Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

      This matter is before the Court on two motions filed by Plaintiff Certain Underwriters at

Lloyd's of London and London Market Companies Subscribing to Policy No. DC 1602445's

("Certain Underwriters"): (1) Certain Underwriters' Motion for Summary Judgment or in the

Alternative Partial Summary Judgment Regarding Defendant/Third Party Plaintiff Trimac

Transportation Group, Inc.'s ("Trimac") Affirmative Defense of Mitigation (Doc. 170) and (2)

Certain Underwriters' Motion for Summary Judgment Regarding Measure of Damages (Doc.

169). This case involves the alleged spoilation or destruction of a shipment of pharmaceutical

products damaged en route while traveling through New Mexico. The two pending summary

judgment motions that are the subject of this Opinion concern damages. First, Certain

Underwriters moves for summary judgment that wholesale acquisition cost is the accurate measure of damages. Second, Certain Underwriters moves for summary judgment on Trimac's affirmative defense of mitigation of damages.

After carefully considering the motions, briefs, evidence, and relevant law, the Court DENIES Certain Underwriters' request for an order that that wholesale acquisition costs applies. The parties may instead brief that issue in an appropriate pretrial motion in limine. As for Certain Underwriters' motion for summary judgment based on mitigation of damages, the Court GRANTS in part and DENIES in part the motion. More specifically, because no record evidence exists that the pharmaceutical products could have been moved to a temporary temperature-controlled facility, summary judgment on this claim is granted. The remainder of the summary judgment motion is denied.

## A.
## BACKGROUND

The Court presents the following facts in the light most favorable to Trimac as the summary judgment nonmovant. *See Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005). Certain Underwriters insured a cargo of pharmaceutical products that was owned by AmerisourceBergen Corporation ("ABC"). ABC is a pharmaceutical sourcing and distribution service company. Plaintiff's Undisputed Material Facts ("Pl.'s UMF") ¶ 1, Doc 170. ABC is one of the largest pharmaceutical distributors worldwide. Defendant's Additional Undisputed Material Facts ("Def.'s AUMF") ¶ B, Doc. 191. ABC buys drug products from pharmaceutical manufacturers and then contracts with motor carriers to transport the products from ABC's national distribution center in Ohio to regional centers across the county. Pl.'s UMF ¶ 1.

ABC purchased the subject drug products at wholesale acquisition cost and contracted with Plaintiff New Prime, Inc. ("New Prime"), a licensed motor carrier, to transport the cargo in

question in a temperature-controlled trailer, a "reefer" trailer, from Ohio to California. *Id.* ¶¶ 2, 19. ABC loaded and sealed the reefer trailer. Def.'s Additional Undisputed Material Facts ("AUMF") ¶ C, Doc. 191.

On December 17, 2016, New Prime's driver Joel Tod Bishop came to a stop on I-40 westbound near Santa Rosa, New Mexico, due to stopped traffic. Pl.'s UMF ¶ 3. A tractor-trailer operated by Trimac and its driver, Donald Hugonin, was also traveling westbound on I-40. *Id.* ¶ 4. The Trimac vehicle rear-ended the New Prime vehicle, resulting in the rear door of the trailer to separate from the trailer and some of the drug products to fall on the roadway. *Id.* ¶¶ 5-6. Police closed the highway because of the number of accidents, and it remained closed until late night. *Id.* ¶ 7.

Ortega's, the towing service responding to the scene, had to use its tractor to tow the New Prime trailer, re-mount and secure the trailer door, and load the trailer onto another trailer for transport to the tow yard in Santa Rosa, New Mexico, which was about 20 miles away. *Id.* ¶ 9. The vehicle was towed at a speed of 20 m.p.h. under a safety escort and arrived at the Santa Rosa tow yard around 9:00 p.m. *Id.* ¶¶ 10, 13. No temperature-controlled storage facility existed in Santa Rosa to store the New Prime vehicle, and the vehicle was too damaged to make the journey to Albuquerque. *Id.* ¶ 11. The few other tow companies located in the Santa Rosa area were not available to move the vehicle to Albuquerque or another city because they were responding to other incidents on I-40. *Id.* ¶ 12. The trailer was moved to Ortega's tow yard and back up against a wall where it remained until transloading began on December 18, 2016. Def.'s AUMF ¶ AA.

From 8:00 a.m. to 6:00 p.m. that next day, Ortega's tow workers moved the drug products onto a replacement trailer that New Prime supplied. Pl.'s UMF ¶ 14. New Prime's

corporate representative was unaware if the Ortega's workers had any specialized training in airflow management in reefer trailers and he was also unaware of any written instructions that would have been given to Ortega's to accomplish the transload. Deposition of Steve Field, 115:16 – 116:8; 122:6-10, Doc. 191-10 ("Field Depo."). George Ortega, the owner of the towing service, was unaware that the cargo was temperature sensitive. Deposition of George A. Ortega, Jr. 39:1-7, Doc. 191-11 ("Ortega Depo."). Trimac's expert concluded that the transload layout was ultimately deficient. Deposition of Patrick Brecht, 131-4 – 132:22, Doc. 191-3 ("Brecht Depo."). New Prime then delivered the products to ABC's regional distribution center in California around 3:30 p.m. the next day, on December 19th. Pl.'s UMF ¶ 15. Ambient temperatures were below 41°F from the time of the crash to the time the drug products were delivered in California. *Id.* ¶ 16. ABC conducted no real-time temperature monitoring. Def.'s AUMF ¶ V.

ABC contacted the pharmaceutical manufactures and sought their instructions on whether the products could be returned to inventory for sale to patients. Pl.'s UMF ¶ 17. Nearly all manufactures instructed ABC to not return the drug products to inventory. Some manufacturers did not provide instructions or stated that they could not provide instructions. *Id.* ¶ 18. In such instances, ABC did not return the products to inventory.

ABC then bought replacements from drug manufacturers at the same wholesale acquisition cost ABC originally paid. *Id.* ¶ 19; Def.'s AUMF ¶ F.

The parties heavily dispute whether ABC had policies and procedures in place to deal with road accidents. ABC had experienced accidents involving breached trailers in the past. *See* Deposition of Sharon Van Sant, 41:25 – 43:3, Doc. 191-6 ("Van Sant Depo."). When asked if ABC had policies and procedures for instructing staff on handling an accident like the one that

occurred in this case, ABC's witness answered "no." *Id*. 43:4-10. The agreement between New Prime and ABC apparently did not have a procedure for transportation of high-value freight. *See* Deposition of Rick Gumucio, 41:2-9, Doc. 191-5 ("Gumucio Depo.") An ABC witness did, however, testify that ABC maintained an in-transit incident procedure for responding to an accident like the one in this case. *See* Deposition of Daniel Y. Pak, 96:22 – 97:15, Doc. 238 ("Pak Depo.") Although ABC had the in-transit procedure in place, it apparently lacked a first response team and had no policy for transloading, which is the process of transferring the damaged goods from one mode of transportation to another. *Id*. at 91:5-12; 97:4-5; 110:1-10. Doc. 191-9; Doc. 23. New Prime had a fleet of about 6,000 trucks. Def.'s AUMF ¶ X.

New Prime drivers Joel and Wendy Bishop picked up the loaded trailer at the ABC facility in Lockbourne, Ohio, and were on an ABC-assigned route. *Id*. ¶ M. ABC never trained the Bishops. *Id*. ¶ N. All training came from New Prime. *Id*. After the accident, Mr. Bishop did stand guard over the cargo until he was relieved. *See* Deposition of Joel Bishop, 24:16-22, Doc. 191-7 ("Bishop Depo.") Mr. Bishop also stated that the load was nonrecoverable once the door seal was broken. *Id*. at 23:18 – 24:4. However, a New Prime witness testified that New Prime does not tell drivers that a load is nonrecoverable just because a seal breaks. Gumucio Depo. at 98:19-25. Bishop Transport lacked an emergency response plan. *Id*. at 85:14-19.

After this lawsuit was commenced, Certain Underwriters moved for summary judgment on Trimac's affirmative defense of failure to mitigate damages raised in Trimac's Answer. *See* Answer, ¶ 56, Doc. 147. Certain Underwriters makes two broad arguments on the inapplicability of the defense. First, it argues that the drug products were not in the control of ABC when the collision occurred, so there was nothing it could have done to mitigate damages. Second, Certain

Underwriters argues that ABC made reasonable, ordinary recovery efforts and that the recovery efforts suggested by Trimac would have been unreasonable, unrealistic, or impracticable.

## B.
## LEGAL STANDARD

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250 (1986). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Id.* at 255.

## C.
## DISCUSSION

As noted earlier, Certain Underwriters' summary judgment motions are based on two different aspects damages. First, Certain Underwriters moves for summary judgment that wholesale acquisition cost is the accurate measure of damages. Second, Certain Underwriters moves for summary judgment on Trimac's affirmative defense of mitigation of damages. The Court will analyze both motions.

**1.     Certain Underwriters' motion for summary judgment declaring wholesale acquisition cost the accurate measure of damages is denied**

Certain Underwriters moves for summary judgment that wholesale acquisition cost is the accurate measure of damages. State law governs recoverable damages in a diversity jurisdiction case. *See Plain v. Murphy Fam. Farms*, 296 F.3d 975, 981 (10th Cir. 2002). In New Mexico, the overall objective in awarding damages, "whether in tort for physical harm to property or in breach of contract or warranty, is to place the plaintiffs in the same financial position regarding the property as they would have been in had there been no damage to the property in the first place." *McNeill v. Burlington Res. Oil & Gas Co.*, 141 N.M. 212, 218, 153 P.3d 46, 52 (N.M. Ct. App. 2007) (citation omitted). The pharmaceutical products allegedly rendered nonsalable were pieces of property. In New Mexico, the basic measure of damages for total destruction of property is "the fair market value of the property immediately before the occurrence." NMRA, Rule 13–1812. "Fair market value" has been described as the price point that "a willing buyer would pay and a willing seller would accept for [the property] in its condition at the time and place in question." *Duke City Lumber Co. v. Terrel*, 88 N.M. 299, 302, 540 P.2d 229, 232 (N.M. 1975). In cases where the damaged property does have salvage value, damages are determined by "the difference between the fair market value of the damaged personal property immediately before the occurrence and its fair market value immediately after the occurrence." NMRA, Rule 13–1814.

Certain Underwriters argues that UJI 13–1812 applies in this case and sets fair market value as the measure of damages for property that was completely destroyed and had no salvage value. Trimac requests an alternate measure of damages called a "transfer price" system, which, according to Trimac, is "the act of determining the prices to use for transactions between related parties, such as parent corporation and one of its subsidiaries." Doc. 179 at 10 (citation omitted). Trimac cites no New Mexico caselaw or rule establishing that transfer pricing is the appropriate

measure of damages. Instead, it relies on secondary sources and one federal district court case where the court applied this measure of damages to damaged insulin that the manufacturer could have theoretically sold to the next affiliate or third-party in the supply chain. *See Eli Lilly & Co. v. Air Exp. Int'l USA, Inc.*, 602 F. Supp. 2d 1260, 1278 (S.D. Fla. 2009), *aff'd in part, vacated in part, rev'd in part*, 615 F.3d 1305 (11th Cir. 2010). Trimac also states that there is, at a minimum, a question of fact about which measure of damages applies, and that the Court can resolve the issue in an appropriate motion in limine.

The Court will deny Certain Underwriter's motion for summary judgment declaring that wholesale acquisition costs is the accurate measure of damages. The more appropriate course is for the parties to develop these arguments in a pretrial motion in limine. However, the Court will say that it has serious doubts about Trimac's proposed measure of damages. Trimac submitted no record evidence of a parent corporation/subsidiary relationship to which the pricing scheme would apply, nor did Trimac make any arguments that such a relationship existed. In addition, New Mexico law governs recoverable damages in a diversity jurisdiction case like this one, and New Mexico's rules in this area appear well-established. As noted earlier, New Mexico's civil jury instructions differentiate in situations where the damaged property does or does not have salvage value, which is still an essential fact to be determined by the jury. Thus, although the Court questions Trimac's proposed measure of damages given the overall clarity of New Mexico's law in this area, the Court will deny Certain Underwriters' request for an order declaring that wholesale acquisition costs is the accurate measure of damages. The parties may brief the appropriate measure of damages in a motion in limine.

2.      **Certain Underwriters' motion for summary judgment on mitigation of damages is granted in part and denied in part**

Certain Underwriters next moves for summary judgment that Trimac's affirmative defense of mitigation of damages does not apply. Certain Underwriters argues that: (1) the defense does not apply as a matter of law because the drug products were not in ABC's control at the time of the collision, (2) the emergency plan proposed by Trimac would have had no real-word effect, (3) a more rapid response to the scene by ABC was not possible, (4) the drug products could not have been moved to a temporary temperature-controlled facility, (5) it was reasonable for ABC to contact the drug product manufacturers to determine whether the drugs could be returned to inventory, (6) it was reasonable for ABC to replace drugs at wholesale acquisition cost. After recounting legal background on New Mexico's law of mitigation of damages, the Court will then address each of Certain Underwriters' arguments.

"It is a well established principle in New Mexico that an injured party has a responsibility to mitigate its damages[.]" *Air Ruidoso, Ltd. v. Executive Aviation Ctr., Inc.*, 122 N.M. 71, 77, 920 P.2d 1025, 1031 (N.M. 1996) (citation omitted). Mitigation of damages (also called the doctrine of avoidable consequences), imposes a duty on the injured party "to use reasonable diligence to mitigate damages incurred either from tort or breach of contract." *Acme Cigarette Services, Inc. v. Gallegos,* 91 N.M. 577, 583, 577 P.2d 885, 891 (N.M. Ct. App. 1978) (Hernandez, J, specially concurring) (citing *Mitchell v. Jones,* 47 N.M. 169, 138 P.2d 522, 524 (N.M. 1943) ("It is well settled that a party must use reasonable diligence to mitigate the damages about to be suffered either from tort or breach of contract.")). "The duty to mitigate damages applies to harm to both personal and real property." *Lowery v. City of Albuquerque*, No. CIV 09-0457 JB/WDS, 2014 WL 7473790, at *34 (D.N.M. Dec. 17, 2014) (citing N.M.R.A. Civ. UJI 13–1820, committee commentary).

If the injured party does not use reasonable diligence to mitigate damages, then that party "run[s] the risk that any award of damages will be offset by the amount attributable to its own conduct." *Air Ruidoso, Ltd.*, 122 N.M. at 77, 920 P.2d at 1031. However, New Mexico courts have explained that the injured party need not incur an "undue risk or burden" to minimize damages. *Skeen v. Boyles*, 146 N.M. 627, 637, 213 P.3d 531, 541 (N.M. Ct. App. 2009) (the duty to mitigate "is required only to the extent that a loss to the injured party could have been avoided without undue risk or burden.") "[A]ll that is required is that the injured party undertake ordinary or reasonable measures to mitigate damages." *Lovelace Med. Ctr. v. Mendez*, 111 N.M. 336, 353, 805 P.2d 603, 620 (N.M. 1991). Mitigation of damages is an affirmative defense, and the party asserting mitigation of damages has the burden of proof. *Hickey v. Griggs*, 106 N.M. 27, 29, 738 P.2d 899, 902 (N.M. 1987).

Certain Underwriters argues, first, that the defense of mitigation does not apply as a matter of law because ABC did not control the drug products, New Prime did. The Court rejects this proposition because Certain Underwriters cites no New Mexico case endorsing or supporting its view. Instead, it relies on treatise's statement that "[c]ourts do not apply the doctrine of avoidable consequences to cases where the property is damaged while out of the owner's control, such as when it is in the possession of a bailee." 22 Am. Jur. 2d Damages § 392. Certain Underwriters is correct that New Mexico's civil jury instruction drafters follow the guidance of the American Jurisprudence approach.[1] But there is no indication that New Mexico courts are aligned with the treatise on the fundamental issue of whether mitigation of damages applies to property that is damaged while out of the owner's control. Because there is no binding authority

---

[1] *See* NMRA UJI 13-1820 (stating that "[t]he duty to mitigate damages to property is set forth in 22 Am. Jur. 2d Damages § 43.") (committee commentary).

supporting Certain Underwriters' argument, its motion for summary judgment on this ground is denied.

Second, Certain Underwriters argues that ABC *did* take reasonable steps to facilitate recovery efforts and that the recovery efforts suggested by Trimac would have been unrealistic and impracticable. Trimac's expert, Dr. Patrick Brecht, is expected to testify that there should have been a list of all 24-hour carriers and dealerships along the travel route; a list of temperature-controlled facilities along the route; written plans on how to handle a damaged trailer; and written instructions on how to transload the products. Certain Underwriters argues that these measures would have had no real-word effect. It points out that Dr. Brecht, by his own admission, was "unable to explain how … such written plans and procedures would have reduced damage to the products." Doc. 170 at 17. Certain Underwriters therefore argues there is "no evidence" that training or written policies would have reduced damages or that telling Ortega's workers how to transload the products would have had any real-world effect. Doc. 237 at 8. The Court disagrees with Certain Underwriter's overall characterization of Dr. Brecht's opinions. The Court has reviewed Dr. Brecht's deposition statements that Certain Underwriters cites, and the Court believes that Dr. Brecht's statements were a reasonable elaboration of his written report. The Court has already determined that Dr. Brecht's opinions are reliable. If Dr. Brecht speculated about the real-world feasibility of emergency protocols and recovery efforts, then it is for Certain Underwriters to vigorously cross-examine him about his opinions at trial.

Third – and related to its second argument – Certain Underwriters argues that a more rapid response to the scene by ABC was not a possible course to mitigate damages. According to Certain Underwriters, substantial evidence shows that winter conditions hampered access to the scene, that only a limited number of tow companies were available for hauls, and that the Trimac

vehicle was itself damaged and carrying hazardous cargo, thereby adding a layer of complexity to the scene. But it ultimately for the trier of fact to draw reasonable inferences from witnesses about their observations of the scene to determine whether a more rapid response was possible. Certain Underwriters' motion for summary judgment on this ground is denied.

Fourth, Certain Underwriters argues that it was reasonable for its insured to contact the drug product manufacturers to determine whether the drugs could be returned to inventory. Trimac apparently believes that ABC should not have relied on the manufacturers' instructions and should have independently assessed whether the drug products could be returned to inventory. The Court concludes that it is ultimately for the jury to determine whether ABC's reliance on manufacturers' instructions was a reasonable recovery effort, or whether ABC should have conducted independent investigations.

Fifth, Certain Underwriters argues that there is no evidence that ABC failed to mitigate damages by purchasing replacement products at wholesale acquisition cost. Trimac argues in response that ABC should have attempted to buy replacement products at a discount and that the jury should decide whether its failure to do so was unreasonable. The Court concludes that Trimac should be able to present facts to a jury that Certain Underwriters' insured did not mitigate damages by not attempting to negotiate a discount. Certain Underwriters portrays this measure as unrealistic because there is no record evidence in the form of testimony, an affidavit, etc., that a pharmaceutical manufacture would have accepted a discount when selling the replacement goods. However, both sides will call experts on certain pharmaceutical industry practices, along with testimony from employees of ABC, New Prime, and others. The jury should be able to hear from these witnesses to determine whether it was reasonable or not for ABC not to negotiate a discount.

Finally, Certain Underwriters argues that the drug products could not have been moved to a temporary temperature-controlled facility because it would have been impracticable, and no such facility existed anyway. As support, Certain Underwriters pointed to George Ortega's testimony that no temperature-controlled facility existed in Santa Rosa. Trimac did not dispute this fact. Nor did it submit evidence to the contrary. As such, there is no evidence from which a jury to conclude that moving the drug products to a temporary temperature-controlled facility was an option. *See Bass Tr. of Andy Bass Fam. Tr. v. Tour 18 at Rose Creek, LP*, 795 F. App'x 613, 624 (10th Cir. 2020) ("When advancing a claim that the plaintiff failed to mitigate damages, the defendant must prove both that a means of mitigation existed and that the proposed course of mitigation would, in fact, have resulted in a reduction of the plaintiff's damages.") (citation omitted). The record therefore contains no evidence that moving the drug products to a temporary temperature-controlled facility was an option. Summary judgment on this allegation is entered in favor of Certain Underwriters.

However, this ruling does not preclude Trimac from presenting evidence in support of its overall argument that New Prime and or/ABC lacked a meaningful emergency plan to respond to an accident like this one. Trimac therefore may present Dr. Brecht's testimony that neither ABC nor New Prime created a detailed emergency action plan for dealing with an accident and Ms. Van Sant's testimony that ABC did not have policies and procedures in place for instructing staff on handling an accident like the one that occurred in this case, along with other evidence. The jury is entitled to hear about the alleged lack of emergency planning. But the jury may not speculate that moving the products to a non-existent facility would have mitigated damages since no such record evidence exists.

13

**CONCLUSION**

For the reasons stated herein, it is therefore **ORDERED** that:

1.      Plaintiff Certain Underwriters' Motion for Summary Judgment Regarding Measure of Damages (**Doc. 169**) is **DENIED**.

2.      Plaintiff Certain Underwriters' Motion for Summary Judgment or in the Alternative Partial Summary Judgment Regarding Defendant/Third Party Plaintiff Trimac Transportation Group, Inc.'s Affirmative Defense of Mitigation is **GRANTED** in part and **DENIED** in part (**Doc. 170**) as explained herein.

        **IT IS SO ORDERED**.


———————————————————————
HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE