UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

CERTAIN UNDERWRITERS AT
LLOYD'S OF LONDON AND LONDON
MARKET COMPANIES SUBSCRIBING
TO POLICY NUMBER DC1602445, and
NEW PRIME, INC.,

    Plaintiffs,

v.     No. 1:18-cv-00336-DHU-LF
      (Consolidated with 1:17-cv-01217-DHU-JHR)

TRIMAC TRANSPORTATION GROUP,
INC., and DONALD HUGONIN,

    Defendants/Third-Party Plaintiff,

v.

BISHOP TRANSPORT, LLC,

    Third-Party Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff New Prime Inc. ("New Prime") and Third-Party Defendant Bishop Transport, LLC's ("Bishop Transport") Motion for Summary Judgment Dismissing Defendant/Third-Party Plaintiff Trimac Transportation Group's ("Trimac")'s Counterclaim and Third-Party Plaintiff's Claims for Contribution. Doc. 176. Trimac responded in opposition, Doc. 217, to which New Prime and Bishop Transport replied. Doc. 232. The Court, having carefully considered the motion, briefs, arguments, and being fully advised, concludes that the motion will be **DENIED**.

# I.
# BACKGROUND[1]

This case concerns the alleged destruction of pharmaceutical products in a wreck between New Prime and Trimac vehicles. New Prime, a licensed motor carrier, and Bishop Transport operated under a 2015 Independent Contractor Operating Agreement ("ICOA"). Pls.' UMF at ¶ 39; ICOA, Ex. M. Under the ICOA, Joel Bishop leased his Peterbilt tractor to New Prime and granted New Prime exclusive possession, control, use, and complete responsibility for the tractor's operation. *Id*. at 1. The ICOA made Bishop Transport responsible for "determin[ing] the means and methods of performance of all transportation services," including delivery routes, and made Bishop Transport responsible for trailer inspections. *Id*. at 1-2; Def.'s AUMF at ¶¶ B, C. Even though the ICOA made Bishop Transport responsible for choosing delivery routes, Bishop testified in a later deposition that "[New] Prime assigned us routes that we had to stick by on the high valued loads only. Any other loads, we could take our own route." Deposition of Joel Bishop 17:22-25, Doc. 176-1 ("Bishop Depo."). New Prime also required Bishop to immediately notify New Prime of a deviation and to inform New Prime when and where he stopped. Pls.' UMF ¶ 51.

Bishop Transport and New Prime also maintained a Personnel Service Agreement ("PSA") that discussed, among things, responsibility for selecting drivers. Pls.' Ex. N, Doc. 176-

---

[1] New Prime and Bishop Transport's summary judgment motion set forth 52 Undisputed Material Facts ("Pls' UMF"). Trimac did not address or dispute Plaintiffs' Undisputed Material Facts 1-14, 16, 19-21; 23; 25-36; 38-39; 41-44; 48-52. So those facts are undisputed. *See* D.N.M.LR-Civ. 56.1(b).

The Court presents all disputed facts in the light most favorable to Trimac. *See Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980) ("On a motion for summary judgment, ... the pleadings and other documentary evidence must be construed in favor of the party opposing the motion.")

14. Upon Bishop Transport's request, New Prime was responsible for supplying drivers who were "deemed … employed by [New] Prime only." *Id*. at 1. New Prime was solely responsible for paying drivers and for providing worker's compensation insurance. *Id*. New Prime and Bishop Transport also agreed in the PSA that New Prime had sole authority to hire and fire drivers, while Bishop Transport had responsibility for the supervision and conduct of drivers. *Id*. at 1, 2.

The Court now turns to the facts concerning the underlying vehicle wreck at issue and its aftermath. In 2016, New Prime hired Bishop Transport to transport a cargo of temperature-controlled pharmaceutical products. Mr. Bishop owned and drove the Peterbilt tractor while New Prime owned the trailer containing the cargo. Pls.' UMF at ¶ 43; Def.'s AUMF at ¶ XX. As Mr. Bishop was traveling west on I-40 in southern New Mexico, he observed stationary traffic that blocked both westbound travel lanes. Pls.' UMF at ¶ 1. In response to the stopped traffic, Bishop brought the truck to a stop in the left-hand lane. *Id*. at ¶ 2.

Sometime later, Trimac's driver, Donald Hugonin, crashed into the rear of the New Prime trailer. The impact caused the New Prime trailer to jack knife and the trailer's rear doors flung open and allegedly exposed the drugs to uncontrolled temperatures. *Id*. at ¶¶ 3, 4-8; Proposed Pretrial Order, Doc. 200, 5. Other drug products were allegedly ejected onto the highway. *Id*.

The parties heavily dispute both Bishop's and Hugonin's ability to avoid the accident. When Bishop stopped the truck, he chose not to pull off into the median because he believed it would not have made sense to do so. Bishop Depo. at 103:5-24, Doc. 190-7. However, Trimac's expert stated that Bishop was at fault for not pulling into the median, and for not taking steps to prevent a foreseeable rear-end accident. Deposition of Lew Grill ("Grill Depo."), 158:2-13, Doc. 190-10. Also, after Bishop stopped the truck, another truck approached and occupied the median

itself. Def.'s AUMF at ¶ R. So by the time Hugonin came along it was not possible for him to use the median as an escape route because the truck was already occupying the median. *Id*. The median therefore was not an open escape route for Hugonin as he approached the traffic. *Id*. at ¶ U.

Bishop and New Prime promptly reported the accident. Pls.' UMF at ¶ 9. Bishop also called AmerisourceBergen Company ("ABC"), the owner of the drug products. *Id*. at ¶ 10. Bishop then stayed with the load to safeguard it. *Id*. at ¶ 11. Because of winter weather conditions and other unrelated collisions on I-40, it took hours for the damaged trailer to be towed. *Id*. at ¶¶ 12, 16. It was nighttime when the trailer reached the tow yard, and the vehicle required an escort. *Id*. at ¶¶ 12, 14.

The New Prime trailer could not have been hauled to a temperature-controlled facility and sending a replacement reefer unit was not an option because of road conditions. *Id.* at ¶¶ 19, 21. Nor could the drug products have been transloaded because the available tow company was busy responding to other emergencies and clearing the highway. *Id*. at ¶ 20. At some point, New Prime did dispatch a replacement driver and trailer. Deposition of Steve Field 123:18-20, Doc. 191-10 ("Field Depo."). Ortega's tow service transloaded the allegedly damaged products onto the replacement trailer and the products were eventually driven to California. Def.'s AUMF ¶¶ QQ.

Another point of contention between the parties is whether ABC, New Prime, or Bishop Transport were adequately prepared for emergencies. Although ABC had encountered breached trailers in the past, Def.'s AUMF at ¶ Z, the New Prime/ABC agreement apparently did not have a procedure for handling high-value spilled freight and the account manager on the New Prime account was unaware of a relevant written policy. Deposition of Richard Gumucio, 41:2-9, Doc.

191-5 ("Gumucio Depo."). ABC's risk manager agreed that ABC lacked policies for handling an accident like the one that occurred in this case and that ABC did not train employees on "product preservation." Deposition of Sharon Van Sant, 43:4-10; 55:16-21, Doc. 191-6 ("Van Sant Depo."). ABC also lacked a first response team and had no policy for transloading, which is the process of transferring the damaged goods from one mode of transportation to another. Deposition of Dan Pak, 91:5-12; 110:1-10. Doc. 191-9 ("Pak Depo.").

Concerning Mr. Bishop, when asked what post-accident responsibilities he had for the load, he answered, "I did everything I could for that load …. There's nothing more I could have done." Bishop Depo. at 89:21-25, 90:1-9. Bishop did not receive specific training for handling accidents involving high-value drug products. And Bishop also believed the load was nonrecoverable once the door seal was broken, *id*. at 23:18 – 24:4, even though a New Prime witness testified that New Prime does not instruct drivers that a broken seal does render a load nonrecoverable. Gumucio Depo. at 98:19-25. For its part, Bishop Transport lacked an emergency response plan of its own. *Id*. at 85:14-19.

New Prime's corporate representative was unaware if Ortega's workers had any specialized training in airflow management in reefer trailers, and he was also unaware of any written instructions that would have been given to Ortega's to accomplish the transload. Field Depo. 115:16 – 116:8; 122:6-10, Doc. 191-10. George Ortega, the owner of the towing service, was unaware that the cargo was temperature sensitive. Deposition of George A. Ortega, Jr. 39:1-7, Doc. 191-11 ("Ortega Depo."). Trimac's expert concluded that the transload layout was ultimately deficient. Deposition of Patrick Brecht, 131-4 – 132:22, Doc. 191-3 ("Brecht Depo.")

After the collision, New Prime settled with ABC. Pls.' UMF at ¶ 52. In a document entitled "Release of All Claims," ABC "forever discharge[d] New Prime, Inc. and … its agents,

… and all other persons, firms, corporations, associations, or partnerships of any and all claims, actions, causes of action, demands, rights damages, costs, loss of service, expenses and compensation whatsoever," resulting from the collision. Pls.' Ex. P.

## II.
## PROCEDURAL HISTORY

On May 31, 2019, Trimac impleaded Bishop Transport. *See* Trimac's Third-Party Compl., Doc. 65. Trimac filed a single count claim for contribution against Bishop Transport, alleging that it and the Bishops committed acts and omissions constituting negligence and negligence per se. *Id*. at 9. A few days later, Trimac filed a counterclaim against New Prime, which also asserted a single count claim for contribution. *See* Trimac's Counterclaim, Doc. 68. New Prime and Bishop Transport filed the instant motion for summary judgment seeking to dismiss Trimac's counterclaim and third-party claims for contribution.

## III.
## LEGAL STANDARD

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250 (1986). In determining whether a

genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Id.* at 255.

While federal summary judgment law governs the sufficiency of the evidence, "the underlying cause of action, with its attendant elements and requirement of proof in a diversity case, is governed by state law." *Moe v. Avions Marcel Dassault-Breguet Aviation*, 727 F. 2d 917, 932 (10th Cir. 1984) (citation omitted); *Burnette v. Dow Chem. Co.*, 849 F.2d 1269, 1274 (10th Cir. 1988). This includes permissible theories of causation under state law and the general means permitted to establish causation. *Hall v. Conoco Inc.*, 886 F.3d 1308, 1316 n.6 (10th Cir. 2018).

## IV.
## DISCUSSION

The Court addresses in turn New Prime and Bishop Transport's arguments that they are entitled to summary judgment because: (1) they were not negligent; or if they were negligent, they were concurrent tortfeasors, and (2) the settlement agreement extinguished their liability.

### A.   Concurrent versus Successive Tortfeasor Liability

New Prime and Bishop Transport argue that they were not negligent at all. Or, assuming they were negligent, they were, at most, concurrent tortfeasors with Trimac. "Under the theory of joint and several liability, each tortfeasor is liable for the entire injury, regardless of proportional fault, leaving it to the defendants to sort out among themselves individual responsibility based on theories of proportional indemnification or contribution." *Payne v. Hall,* 139 N.M. 659, 664, 137 P.3d 599, 604 (N.M. 2006). However, New Mexico has generally abolished joint and several liability in favor of pure comparative fault, also called several liability. *See* N.M. Stat. Ann. § 41 – 3A – 1; *Safeway, Inc. v. Rooter 2000 Plumbing & Drain SSS*, 368 P.3d 389, 396 (N.M. 2016) ("[j]oint and several liability is not to be retained in our pure comparative negligence system on a theory of one indivisible wrong") (quoting *Bartlett v. N.M. Welding Supply, Inc.,* 98 N.M. 152,

7

646 P.2d 579 (N.M. Ct. App. 1982)). Under the doctrine of comparative fault, "when concurrent tortfeasors negligently cause a single, *indivisible* injury, the general rule is that each tortfeasor is severally responsible for its own percentage of comparative fault for that injury." *Payne*, 139 N.M. at 663, 137 P.3d at 603 (emphasis in original).

New Mexico does, however, retain joint and several liability under certain exceptions. One such exception is the successive tortfeasor doctrine. *Id.* at 664, 137 P.3d at 604; *Gulf Ins. Co. v. Cottone*, 140 N.M. 728, 734, 148 P.3d 814, 820 (N.M. Ct. App. 2006). That doctrine applies in situations when successive tortfeasors cause two separate and distinct injuries. *Payne*, 139 N.M. at 664, 137 P.3d at 604. If an injury caused by an original tortfeasor "causally leads to a second distinct injury, or a distinct enhancement of the first injury, caused by a successive tortfeasor," then the original tortfeasor is jointly and severally liable for the full extent of both injuries. *Id.* (citing *Lujan v. Healthsouth Rehabilitation Corp.,* 120 N.M. 422, 426, 902 P.2d 1025, 1029 (N.M. 1995)). The successive tortfeasor is only responsible for the second injury or for the distinct enhancement of the first injury. *Id.* (citation omitted). "Two distinct injuries caused by distinct agents must exist for successive tortfeasor liability to apply." *Cottone*, 140 N.M. at 734, 148 P.3d at 820. Otherwise, the tortfeasors will likely be treated as concurrent tortfeasors, in which case normal comparative fault principles apply. *See Payne*, 139 N.M. at 663, 137 P.3d at 603. If successive tortfeasor liability is established, then a right of contribution is present.

New Prime and Bishop Transport argue that there is no right of contribution because they were not negligent at all. *See Standhardt v. Flintkote Co.*, 84 N.M. 796, 805, 508 P.2d 1283, 1292 (N.M. 1973) ("Where there is no negligence, there can be no right of contribution."). Or, assuming *arguendo* that they were negligent, New Prime and Bishop Transport contend that their

negligence did not cause a separate, discrete injury to Certain Underwriter's insured. In other words, they state that even if Mr. Bishop was negligent by stopping in the roadway, the entire injury–damage to cargo–was caused by Trimac alone because its driver negligently slammed into the trailer. If New Prime and Bishop Transport were somehow negligent, they argue, then they would be concurrent tortfeasors with Trimac and that comparative fault principles would apply.

For its part, Trimac counters that the second injury consisted of the "the poor emergency response and inadequate and delayed transload onto a replacement trailer," which separately harmed Certain Underwriters. Doc. 217 at 23. It also states that its two designated expert witnesses will testify that Mr. Bishop's stopping of the truck in a travel lane rather than the median created a foreseeable risk of harm that the New Prime truck would be rear ended. Trimac also argues that a genuine issue of material fact exists about whether New Prime and Bishop Transport's handling of the emergency was negligent.

The Court concludes that the evidence about the divisibility of the injury is sufficiently conflicting for Trimac to survive summary judgment. As the New Mexico Supreme Court has explained, if "causation of an original injury is contested, then it would not be appropriate for the trial judge to make this determination [on the application of the successive tortfeasor doctrine] in place of the jury." *Payne*, 139 N.M. at 670, 137 P.3d at 610. The court recognized that submitting the question to the jury "may add a certain amount of complexity" to the proceedings because

> during trial, the parties may have to deal with the possibility that, ultimately, successive tortfeasor theory may not apply at all, depending on how the jury answers certain questions regarding injury and causation. Ultimately, the case may be decided on the basis of several liability and comparative fault among concurrent tortfeasors, as opposed to joint and several liability among successive tortfeasors. Or, the jury may be given a choice of theories to apply, depending on how it answers certain interrogatories.

*Id.* at 139 N.M. at 670, 137 P.3d at 610. Nevertheless, as the New Mexico Supreme Court explained, only "[i]f the existence of a causally-distinct injury is undisputed, then the trial court can determine, as a matter of law, that successive tortfeasor theory applies." *Id.* Otherwise, "[w]hen the evidence is unclear, factual questions are best left to the jury[.]" *Id.*

Here, Trimac does not dispute that its driver rear ended the New Prime vehicle, thereby exposing the drug products to an uncontrolled environment. Trimac does dispute, however, whether New Prime and Bishop Transport contributed to that injury by Mr. Bishop's stopping of the vehicle in the travel lane rather than the median. The Court believes the jury should evaluate these conflicting views of the evidence rather than granting summary judgment as a matter of law to New Prime and Bishop. As the *Payne* court suggested, successive tortfeasor theory may not apply at all depending on the jury's evaluation of the evidence and the doctrine's overall narrowness. The jury may well find that New Prime and Bishop were not negligent at all, or alternatively, that those parties were concurrent tortfeasors with Trimac, whose combined negligence produced a single injury. In such a scenario, normal comparative fault principles would apply. Because these are matters for the jury to ultimately decide, New Prime and Bishop Transport's motion for summary judgment on the inapplicability of the successive tortfeasor doctrine is denied.

### B.     Effect of the Settlement

New Prime and Bishop Transport next move for summary judgment on the basis that a settlement agreement extinguished their liability. New Prime settled with ABC after the collision. Under the terms of the settlement, ABC "forever discharge[d] New Prime, Inc. and … its agents … of any and all claims," resulting from the collision. Pls.' Ex. P. Based on this language, New Prime and Bishop argue that: (1) the release extinguished New Prime's "liability

with regard to [Certain Underwriters'] claim" and (2) extinguished Bishop Transport's liability because Bishop Transport was New Prime's agent. Doc. 176 at 19.

The Court addresses New Prime and Bishop Transport's first argument, that Trimac cannot recover for contribution because New Prime has already settled with ABC. In New Mexico, contribution is governed by N.M. Stat. Ann. § 41–3–2(A), which confers a "right of contribution … among joint tortfeasors." *Id.*; *Payne*, 139 N.M. at 664, 137 P.3d at 604. The term "'joint tortfeasors' means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." N.M. Stat. Ann. § 41–3–1. A joint tortfeasor who settles with a claimant "is not entitled to recover contribution from another joint tortfeasor whose liability to the injured person is not extinguished by the settlement." *Id.* at § 41–3–2(C).

The right of contribution applies to situations where the tort is successive, not concurrent. *Cottone*, 140 N.M. at 736, 148 P.3d at 822 (stating that because the parties were "concurrent, not successive, tortfeasors … contribution among tortfeasors is inapplicable."); *Wilson v. Galt*, 100 N.M. 227, 231, 668 P.2d 1104, 1108 (N.M. Ct. App. 1983). Because New Mexico utilizes a comparative fault system, "no need exists for [a tortfeasor] to ... seek contribution from other tortfeasors or to protect himself against having to contribute [to others]" because each tortfeasor is responsible for its own percentage of comparative fault. *Cottone*, 140 N.M. at 733, 148 P.3d at 819.

When a tort victim settles with one tortfeasor, New Mexico courts have described the effect of the settlement as follows:

> if an injured person settles and releases one tortfeasor, the consideration paid would satisfy only that tortfeasor's percentage of fault, even though no jury determination of the amount of his liability exists at the time of settlement. If the injured person pursues his claim against the other tortfeasors, recovery will be

11

> only against them for their respective shares of fault. Thus, the injured person, by settling, would not recover more than his total damages, because each tortfeasor would pay, by settlement or judgment, only his respective share. The factfinder would still assess the injured person's total damages and apportion fault among all tortfeasors, present or absent.

*Wilson*, 100 N.M. at 232, 668 P.2d at 1109.

Here, the Court cannot enter summary judgment that the settlement extinguished New Prime's liability as a matter of law. First, as noted earlier, there is a question of fact about whether the parties were concurrent or successive tortfeasors. If the jury finds that the successive tortfeasor doctrine applies, then a right of contribution exists. *See Cottone*, 140 N.M. at 736, 148 P.3d at 822. But if the evidence establishes that the parties were severally at fault, then normal comparative fault principles would apply and each tortfeasor would pay, by settlement or judgment, only its respective share according to its fault. *See Wilson*, 100 N.M. at 232, 668 P.2d at 1109. Because the jury has not yet "assessed the injured person's total damages and apportion[ed] fault among all tortfeasors," summary judgment must be denied. *Id*.

And now the Court addresses New Prime and Bishop Transport's second argument concerning the settlement, which is that the settlement extinguished Bishop Transport's liability because Bishop Transport was New Prime's agent. Doc. 176 at 19. Recall that under the settlement agreement ABC discharged claims against "New Prime, Inc. and … its *agents*[.]" Pls.' Ex. P (emphasis added). New Prime argues that Bishop Transport was its agent; Trimac argues that the jury should decide whether Bishop Transport was an agent or independent contractor.

"An agent is one authorized by another to act on his behalf and under his control." *Hansler v. Bass*, 106 N.M. 382, 743 P.2d 1031, 1036 (N.M. Ct. App. 1987). "[A] principal is liable for tortious conduct of an agent when the conduct was within the scope of the agent's

actual authority." *Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1250 (10th Cir. 2020). In contrast, "[a]n independent contractor is defined as a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." *Talbott v. Roswell Hosp. Corp.*, 138 N.M. 189, 192, 118 P.3d 194, 197 (N.M. Ct. App. 2005) (citation, quotation marks, and italics omitted). "[I]ndependent contractors are not ordinarily agents" and so there is no principal-agent relationship. *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010); *see also Alfaro-Huitron*, 982 F.3d at 1252.

"New Mexico courts have employed an agency analysis to determine whether an individual is acting as an independent contractor or as an [agent]." *Celaya v. Hall*, 135 N.M. 115, 85 P.3d 239, 242 (N.M. 2004). The principal's right to control the individual performing the work often distinguishes an agent from an independent contractor. *Id.* "A right to control analysis focuses on whether the principal exercised sufficient control over the agent to hold the principal liable for the acts of the agent." *Id.* New Mexico courts consider:

    1) "the type of occupation and whether it is usually performed without supervision;"

    2) "the skill required for the occupation;"

    3) "whether the employer supplies the instrumentalities or tools for the person doing the work;"

    4) "the length of time the person is employed;"

    5) "the method of payment, whether by time or job;"

    6) "whether the work is part of the regular business of the employer;"

    7) "whether the parties intended to create an employment relationship;"

    8) "whether the principal is engaged in business[,]" and,

    9) "the degree of control exercised by the principal over the details of the agent's work[.]"

13

*Korba v. Atl. Circulation, Inc.*, 148 N.M. 137, 139, 231 P.3d 118, 120 (N.M. Ct. App. 2010).

"[N]o particular factor should receive greater weight than any other, except when the facts so indicate, nor should the existence or absence of a particular factor be decisive." *Harger v. Structural Servs., Inc.*, 121 N.M. 657, 916 P.2d 1324, 1334 (N.M. 1996). "Rather, the totality of the circumstances should be considered in determining whether the employer has the right to exercise essential control over the work or workers of a particular contractor." *Id.* "Normally, the existence of an employment relationship is a question of fact." *Headley v. Morgan Mgmt. Corp.*, 137 N.M. 339, 110 P.3d 1076, 1079 (N.M. Ct. App. 2005). "However, where reasonable people cannot differ on the issue, the court may grant summary judgment." *Id.*

The parties made no arguments concerning "the type of occupation and whether it is usually performed without supervision;" "the method of payment, whether by time or job;" "whether the work is part of the regular business of the employer;" and "whether the principal is engaged in business." The Court therefore limits its analysis to the factors that the parties expressly discussed.

First, concerning the parties' intent, the parties' signed agreement is titled "Independent Contractor Operating Agreement" and provides that "[t]he parties agree that the intent of this Agreement is to establish an independent contractor relationship." Pls.' Ex. M, Doc. 176-13. The parties' labeling of their relationship is not necessarily controlling. *See New Mexico Mil. Inst. v. NMMI Alumni Ass'n, Inc.*, 458 P.3d 434, 440 (N.M. Ct. App. 2019) ("The existence of an agency relationship does not depend on the name that the parties use to describe their relationship.") (citation omitted). But given that the parties' written agreement plainly expressed an intent to create an independent contractor relationship, the Court considers the ICOA non-dispositive, but

highly persuasive evidence from which the jury could find an intent to create an independent contractor relationship.

Second, concerning the degree of control New Prime maintained over Bishop's work, this factor is not resolvable by the Court on a motion for summary judgment. New Prime argues that Bishop's exclusive lease with New Prime for his tractor and professional services indicates an agency relationship. However, this lease could reflect the parties' attempt to comply with legal requirements because federal motor carrier regulations "require carriers to either own their trucking equipment or to enter into written leases in which the owner of the equipment grants the use of equipment, with or without driver, for a specified period ... for use in the regulated transportation of property, in exchange for compensation." *Clarendon Nat. Ins. Co. v. Medina*, 645 F.3d 928, 931 (7th Cir. 2011) (citation omitted). Pursuant to the parties' written lease, Bishop furnished his tractor and a "qualified driver," (himself) to New Prime. Pls.' Ex. M at 1. Although a jury could find that an exclusive lease indicates a principal-agent relationship, the trier of fact could also find that the lease was an attempt by the parties to comply with federal motor carrier regulations.

Other facts concerning New Prime's right to control Bishop's work are sufficiently disputed. New Prime dictated routes for high value loads, but for ordinary loads Bishop could choose his own route. The ICOA itself stated that Bishop would determine "the means and methods of performance of all transportation services … including driving times and delivery routes," and thus there is sufficiently conflicting evidence in the record about New Prime controlled Bishop's routes. Pls.' Ex. M at 1. Moreover, Bishop Transport drove under New Prime's DOT authority and the bill of lading listed New Prime as the motor carrier, which a jury could find is suggestive of a principal-agent relationship.

The evidence concerning control over drivers is sufficiently disputed, if not entirely clear. New Prime stresses that the Personnel Service Agreement empowered New Prime to hire drivers and that such drivers were deemed New Prime's "employees." But it is not clear if this provision applies to Bishop as the driver. The PSA stated that New Prime would supply drivers "upon request" of Bishop Transport. Pls.' Ex. N at 1. There is no indication that Bishop requested drivers. He had the option to drive the load himself, which he did. Thus, although New Prime had control over hired drivers, there is no evidence that Bishop requested a hired driver. Furthermore, the parties made no clear arguments about whether the PSA applied to Bishop as the driver. The jury therefore will evaluate the facts and circumstances of the parties' various agreements to determine whether New Prime exercised control.

Third, there is a genuine dispute of fact about whether New Prime supplied tools or instrumentalities. New Prime stresses that it had exclusive possession, control, and use of the tractor and complete responsibility for its operation. But this evidence is not enough to obtain summary judgment because it was Bishop who owned and supplied the tractor. Therefore, one of the main tools of the job, the tractor, was owned and supplied by Bishop, not New Prime. On the other hand, New Prime did provide other tools or instrumentalities such as identification devices, placards or decals, and a Qualcomm device, thereby creating a fact question for the jury concerning whether Bishop was an agent or independent contractor.

Fourth, concerning the length of time of the relationship, "from June 26, 2015 until the time of the accident," which was December 17, 2016, "Bishop Transport could only haul for [New] Prime." Doc. 176 at 20-21. The parties made no serious attempt to explain whether this work relationship suggested a principal-agent relationship, so the jury will decide whether the

duration of this relationship was indicative of an agency relationship or an independent contractor relationship.

Fifth and finally, Trimac argues that truck driving is a highly skilled job. New Prime and Bishop Transport made no arguments to the contrary. Therefore, the Court will treat as undisputed for summary judgment purposes that truck driving is a highly skilled job.

As noted earlier, the parties made no arguments concerning the remaining factors of "the type of occupation and whether it is usually performed without supervision;" "the method of payment, whether by time or job;" "whether the work is part of the regular business of the employer;" and "whether the principal is engaged in business." The Court therefore does not address these factors.

In summary, a weighing of the pertinent factors shows that there is a genuine issue of fact about whether New Prime and Bishop Transport created a principal-agent relationship or an independent contractor relationship, thereby requiring resolution by the factfinder.

## CONCLUSION

For the reasons stated herein, it is therefore **ORDERED** that New Prime Inc. and Bishop Transport, LLC's Motion for Summary Judgment Dismissing Trimac's Counterclaim and Third-Party Plaintiff's Claims for Contribution **(Doc. 176)** is **DENIED**.

HON. DAVID HERRERA URIAS
UNITED STATES DISTRICT JUDGE